IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

KRISTEN WHITWORTH, and TOMISHA
LEWIS, Individually
and on Behalf of Others Similarly Situated,                    PLAINTIFFS

     v.          CASE NO. 6:13-CV-6003

FRENCH QUARTER PARTNERS, LLC,
Individually and d/b/a FRENCH QUARTER;
DALE KLOSS a/k/a DUKE KLOSS, Individually
and d/b/a FRENCH QUARTER                    DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court for decision following a two-day bench trial that began on May 19, 2014. Also before the Court are the parties' post-trial briefs (Docs. 66-68). Plaintiffs, individually and on behalf of others similarly situated, alleged Defendants violated the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA"), the Arkansas Minimum Wage Act, Ark. Code Ann. § 11-4-201, *et seq.* ("AMWA"), and Arkansas common law. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court enters the following Findings of Fact and Conclusions of Law, based upon consideration of the admissible evidence and the Court's assessment of the credibility of the trial witnesses.

## Findings of Bare Facts

During the trial, the following facts were established by a preponderance of the evidence:

1.   French Quarter Partners, LLC is an Arkansas limited liability company which operates French Quarter, a club in Hot Springs, Arkansas that provides adult entertainment in the form of exotic dancers.

2.   Plaintiffs were dancers who worked at French Quarter.

3.   French Quarter Partners, LLC consists of two members, Separate Defendant Dale Kloss ("Kloss") and R.K.  S.H. is president of French Quarter Partners, LLC.

4.   French Quarter employs a General Manager, three managers, and a hostess.

5.   N.Z. was the general manager of French Quarter at all relevant times, and was hired by Kloss.

6.   S.H. is N.Z.'s direct supervisor.

7.   Plaintiffs Kristen Whitworth and Tomisha Lewis and opt-in plaintiff Krystyna Nwachukwu were interviewed and hired by N.Z., and not Kloss.

8.   Plaintiff Whitworth performed at French Quarter as an exotic dancer from June 2009 until September 2011.

9.   Plaintiff Lewis performed at French Quarter as an exotic dancer from January 2010 until May 2010.

10.  Opt-in plaintiff Nwachukwu performed at French Quarter as an exotic dancer from March 2010 to July 2010.

11.  Plaintiffs' primary duties "were dancing on stage during the stage rotation ('stage dances'), spending time with customers in semi-private rooms, and performing personal dances for customers called 'lap dances'".

12.  Plaintiffs bought their own clothes, shoes, and cosmetics. Plaintiffs chose what clothes to wear to French Quarter, within limits set by Defendants.

13.  Performers would choose their own songs off the jukebox while dancing on the stage.  The collection of music available on the jukebox was selected by Defendants.

14.  French Quarter had two shifts per day Monday through Saturday, and one shift on Sunday.  The dancers would sign up each week for the next week's shifts on a schedule prepared in conjunction with French Quarter management.

15.  Performers who worked day shifts were guaranteed a minimum payment of $75.00.

16.  Plaintiffs were not paid hourly wages for working night shifts at French Quarter.

17.  Kloss established the prices on French Quarter's menu prior to 2001.

18.  French Quarter established the amounts charged to its customers for private dances, lap dances, and "ladies' drinks".

19.  French Quarter required that all money the dancers received from customers be immediately turned over to management.

20. After being turned over to management, the money was then counted and the amount recorded on a card specific to each dancer.
21. At the end of each night shift, French Quarter paid out cash to each dancer equivalent to ninety percent of amounts she received as tips for stage dances and fifty percent of amounts received for private dances and ladies' drinks.
22. French Quarter did not include the cash it paid out to dancers as part of its gross income for tax purposes.
23. French Quarter management tracked the club's total revenues on a shift-by-shift basis using a shift report form created by Kloss.
24. French Quarter provides and maintains the club's facilities, furniture, sound system, and décor.
25. French Quarter sells food and non-alcoholic beverages to customers and dancers.
26. French Quarter advertised for the club, including advertisement via the Internet.
27. Kloss visited French Quarter four to five times per week. Kloss sometimes discussed business with French Quarter management, although he claims that his visits were strictly for social purposes. Kloss also goes by "Doc" and "Duke."
28. In 2010, Lewis reported the money she received from the customers to the Internal Revenue Service as tip income.
29. Kloss's employees made the daily deposits for French Quarter.
30. When a customer wanted to pay for dances or ladies' drinks via credit card, either a waitress or the customer would take the card to the bar so that the payment could be processed at the credit card machine.
31. Plaintiffs did not dance under their given names at French Quarter; instead, each dancer chose a name from several pre-selected options presented to her by French Quarter management.
32. There were not supposed to be multiple dancers using the same name at the same time at French Quarter; however, there were times when more than one dancer used the same name for some period of time.
33. Tax returns for French Quarter Partners, LLC were prepared by John H. Foster, an accountant, based upon income statements and balance sheets provided to him by French Quarter management.
34. French Quarter was operated by King Pawn Shop, Inc. for the first three quarters of 2010.
35. Foster prepared a tax return King Pawn Shop, Inc. for 2010 that showed $223,491 in gross receipts or sales and

$204,437 in total income.

36.  The tax return for the last quarter of 2010 for French
     Quarter Partners, LLC showed $71,681 in gross receipts or
     sales and $71,561 in total income.

37.  The 2011 tax return for French Quarter Partners, LLC showed
     $422,804 in gross receipts or sales and $423,618 in total
     income.

## Discussion

### 1. FLSA Coverage

The Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*
("FLSA") provides that "[e]very employer shall pay to each of
his employees who in any workweek is engaged in commerce or in
the production of goods for commerce, or is employed in an
enterprise engaged in commerce or in the production of goods for
commerce" a minimum wage.  29 U.S.C. § 206(a).  "'Commerce'
means trade, commerce, transportation, transmission, or
communication among the several States or between any State and
any place outside thereof."  29 U.S.C. § 203(b).  "'Enterprise'
means the related activities performed (either through unified
operation or common control) by any person or persons for a
common business purpose . . . ."  29 U.S.C. § 203(r)(1).
"Enterprise engaged in commerce or in the production of goods
for commerce" refers to an enterprise that "(A)(i) has employees
engaged in commerce or in the production of goods for commerce,
or that has employees handling, selling, or otherwise working on
goods or materials that have been moved in or produced for
commerce by any person; and (ii) is an enterprise whose annual

Page 4 of 30

gross volume of sales made or business done is not less than $500,000 . . . ." 29 U.S.C. § 203(s)(1).

As an initial matter, this Court must determine whether there is FLSA coverage in the instant case. Under 29 U.S.C. § 206, the FLSA provides for two types of coverage: (1) individual employee coverage (when an employee is herself "engaged in commerce or in the production of goods for commerce"), and (2) enterprise coverage (when the employee is "employed in an enterprise engaged in commerce or in the production of goods for commerce"). An employer must pay an employee a minimum wage as provided under the FLSA if either type of coverage is present. The Court finds that there is FLSA enterprise coverage in this case. The evidence showed that French Quarter has employees handling and selling goods and materials that have been moved in or produced for commerce (i.e., French Quarter employed waitresses to sell food, drinks, and cigarettes that were produced for and moved in commerce). In addition, the Court finds that French Quarter is an enterprise whose annual gross volume of sales made or business done is not less than $500,000. Defendants contend that French Quarter's annual income did not meet this $500,000 threshold for the years relevant to this lawsuit.

The testimony given at trial indicated that all amounts paid to the dancers for dance fees and tips were turned over

immediately to French Quarter management.  The money was then counted and the amount recorded on a card specific to each dancer.  At the end of each night shift, French Quarter paid out cash to each dancer equivalent to ninety percent of amounts she received as tips for stage dances and fifty percent of amounts received for private dances and ladies' drinks.  The testimony and evidence presented at trial made it clear that French Quarter did not include the cash it paid out to dancers as part of its gross income for tax purposes.

For FLSA purposes, however, the inquiry is not whether French Quarter's annual income reported for tax purposes exceeded the $500,000 threshold, but whether the club's annual gross volume of sales made or business transacted was over $500,000.  In light of the fact that all amounts received by the dancers were initially handed over into the care and custody of French Quarter's management, it is reasonable to include all such amounts in a calculation of the total amount of "business done" by the club.  An examination of the records of French Quarter which have been admitted into evidence in this case shows that the club did more than $500,000 in total business in each of the relevant years, and it should accordingly be treated as an enterprise engaged in commerce for purposes of the FLSA.[1]

---

[1] The Court notes that the evidence presented could support a finding that Plaintiffs were individually engaged in commerce such that individual employee coverage also exists in this case.  However, having found that

## 2. **Plaintiffs' Employee Status**

As there is FLSA coverage in this case, the next inquiry is whether Plaintiffs were employees of French Quarter. The FLSA defines an "employee" as "any individual employed by an employer," and it states that "employ" includes "to suffer or permit to work." 29 U.S.C. §§ 203(e)(1), 203(g). The courts have accordingly recognized the FLSA's definition of "employee" to be quite broad. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (noting that the verb "employ" under the FLSA is defined with "striking breadth"). In determining whether an individual is an employee, the courts look to the "economic reality" of all of the circumstances concerning whether the putative employee is economically dependent upon the alleged employer. *See Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947); *Aimable v. Long & Scott Farms*, 20 F.3d 434, 439 (11th Cir. 1994).

In order to assess the degree of economic dependence present in this case, the following factors will be considered: (1) the degree of control exercised by the employer over the workers; (2) the workers' opportunity for profit or loss and their investment in the business; (3) the degree of skill and independent initiative required to perform the work; (4) the

_____

enterprise coverage exists, it is not necessary to decide whether there is also individual coverage under the FLSA.

permanence or duration of the working relationship; and (5) the extent to which the work is an integral part of the employer's business. *Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 11 (D.C. Cir. 2001); *see also United States v. Silk*, 331 U.S. 704 (1947); *Brock v. Superior Care, Inc.*, 840 F.2d 1054 (2nd Cir. 1988). No one factor alone is dispositive; instead, courts must look to the totality of the circumstances with an eye to determining the degree to which an individual is dependent upon the alleged employer. *Morrison*, 253 F.3d at 11. "[T]he final and determinative question must be whether the total of the testing establishes the personnel are so dependent upon the business with which they are connected that they come within the protection of the FLSA or are sufficiently independent to lie outside its ambit." *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311-12 (5th Cir. 1976).

### A. Degree of Control

In analyzing the first factor of the economic reality test - the degree of control exercised by the employer over the workers - the question that must be answered is whether a dancer's "freedom to work when she wants and for whomever she wants reflects economic independence, or whether the freedoms merely mask the economic reality of dependence." *Reich v. Priba Corp.*, 890 F. Supp. 586, 592 (N.D. Tex. 1995) (*citing Mednick v. Albert Enterprises, Inc.*, 508 F.2d 297, 300-02 (5th Cir. 1975)).

"An employer cannot saddle a worker with the status of independent contractor, thereby relieving itself of its duties under the F.L.S.A., by granting him some legal powers where the economic reality is that the worker is not and never has been independently in the business which the employer would have him operate." *Mednick*, 508 F.2d at 303.

Plaintiffs were undoubtedly afforded a measure of discretion and flexibility with regard to the work they performed at French Quarter, although often within certain bounds established by club management. Plaintiffs were allowed to choreograph their own dances and choose their own costumes (subject to approval by club management). They were also allowed to select the music that would accompany their stage performances, although their choices were limited to the songs available in the jukebox, which was provided by French Quarter. They were allowed to consume alcohol and smoke cigarettes while working. They were allowed to dance at other clubs during the same time period that they danced at French Quarter (although the testimony established that none of them did so). They worked with management to create the schedule that would determine which days and nights they would work for the next week, and they were allowed to stay and work a night shift after finishing a day shift if they so desired.

Despite permitting this degree of flexibility, French

Quarter management still exercised considerable control over its dancers. The testimony established that dancers at French Quarter were generally expected to abide by certain rules while working at the club (although it appears that these rules were not all consistently enforced). Dancers working the night shift were expected to show up by 7:30 p.m. and be ready to work by 7:45 or 8:00 p.m., and dancers could be fined for showing up late. Dancers were encouraged to be on the schedule for four shifts per week, and it was suggested that they work two or three weekday shifts before being allowed to work on a weekend. Dancers were expected to perform on stage when their turn came up based upon the rotation system established by the club. Plaintiffs' telephone usage at the club was restricted, and dancers were not supposed to leave while on a shift even if there were no customers present. Dancers were not supposed to hire themselves out to dance in people's homes or at parties. According to a policy published on French Quarter's menu, dancers were not allowed to leave the club with customers.

Significantly, the prices to be charged for private dances and ladies' drinks were set by the club with no input from the dancers. When a customer purchased a "lady's drink," the dancers were expected to spend fifteen minutes to a half-hour conversing with the customer. If she left the table too early – or stayed too long - management would intervene. If a dancer

began a private dance for a customer but did not finish it, she would not receive any money for the dance as per club policy. Furthermore, dancers were required to immediately turn over all moneys they collected from customers for dance fees and tips to club management.  Defendants were also responsible for the décor and overall atmosphere of the club, for setting the club's operating hours, and ultimately for the flow of customers to the club.

Although Plaintiffs enjoyed a certain amount of flexibility as French Quarter dancers, the degree of control exercised by the club reflects the reality that the dancers were economically dependent on the club.  The Court accordingly finds that this factor weighs in favor of Plaintiffs' employee status.

### B. Opportunity for Profit and Loss and Investment in the Business

Plaintiffs were required to make some amount of investment in order to dance at French Quarter.  Specifically, they were responsible for purchasing their own costumes, shoes, and cosmetics.  The evidence showed the amount of investment Defendants made in the business to be considerably larger. French Quarter Partners, LLC procured the space to operate the club by paying rent to Kloss,[2] and was also responsible for

---

[2] The testimony reflected that the club is approximately 2,000 square feet in total size (1,000 square feet on the main level and 1,000 square feet in the basement), and that although there is no written lease agreement in place,

procuring the club's business license.  Defendants took care of club maintenance, cleaning, and renovations, such as having new carpet installed.  The club provided the jukebox and sound equipment, as well as the monitors and camera equipment that allowed the customers to see the stage from any direction. French Quarter is also responsible for its own advertising, including maintenance of a website and internet advertising. The investment of the individual dancers is quite small in comparison to Defendants' investment in the operations of the club.

As Defendants were responsible for the investment capital required to operate the club, Defendants are likewise the ones who bear the ultimate risk of loss and enjoy the opportunity for substantial profit.  As Kloss admitted in his testimony, the business of French Quarter is structured in such a way that the dancers will never have the same opportunity for profit as the owner of the business.  Plaintiffs have no ownership interest in the club, and they bear no risk of economic loss.  The worst a dancer can do on any given night is to make no money if she receives no tips or dance fees.

"The ability of an exotic dancer to entice her customers to give large tips is known in the industry as 'hustling.'"

---

French Quarter Partners, LLC pays rent to Kloss in the amount of $15,000 per month.

*Thompson v. Linda and A., Inc.*, 779 F. Supp. 2d 139, 149 (D.D.C. 2011) (*citing Harrell v. Diamond A Entm't, Inc.*, 992 F. Supp. 1343, 1350-52 (M.D. Fla. 1997)). Although it is apparent that Plaintiffs' ability to earn tip income while performing at French Quarter was dependent to a degree on their own initiative, hustle, costume, and rapport with customers, courts have not found the "hustling" argument to be relevant in evaluating the opportunity for profit or loss factor of the economic reality test. *See id.* Instead, the appropriate inquiry has more to do with the relative investments of the parties (as discussed above) and who has control over larger aspects of the business. "That a dancer may increase her earnings by increased 'hustling' matters little. As is the case with the zealous waiter at a fancy, four-star restaurant, a dancer's stake, her take and the control she exercises over each of these are limited by the bounds of good service; ultimately, it is the restaurant that takes the risks and reaps the returns." *Harrell*, 992 F. Supp. at 1352.

In this case, as in others, the dancers are "far more closely akin to wage earners toiling for a living, than to independent entrepreneurs seeking a return on their risky capital investments." *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1051 (5th Cir. 1987), *cert denied*, 484 U.S. 924 (1987). The Court finds that this factor of the economic reality test

also weighs in favor of Plaintiffs' employee status.

## C. Degree of Skill and Initiative Required

Other courts to have considered the issue have found that "little specialized skill is required to be a nude dancer." *Thompson*, 779 F. Supp. 2d at 149 (*citing Morse v. Mer Corp.*, No. 1:08-CV-1389, 2010 WL 2346334, at *5 (S.D. Ind. 2010); *Harrell*, 992 F. Supp. at 1351; and *Reich v. Circle C. Invs., Inc.*, 998 F.2d 324, 328 (5th Cir. 1993)). Regardless of the amount of skill actually possessed by Plaintiffs, the inquiry is whether any particular degree of skill was *required* in order to dance at French Quarter. The testimony established that French Quarter did not require its dancers to have any prior experience or any specialized training, certification, or skill.

With regard to the "initiative" contemplated by this factor, courts have concluded that a dancer's ability to develop and maintain rapport with customers (as discussed above) lies outside of its scope. *See Circle C. Invs.*, 998 F.2d at 328 (*citing Mr. W Fireworks*, 814 F.2d at 1053); *see also Priba Corp.*, 890 F. Supp. at 593 ("The ability to converse with club clientele in an effort to generate a larger tip is not the type of initiative contemplated . . . ."). This factor instead contemplates certain elements of business initiative, such as attempts to advance a business and expand its client base and goodwill through advertising, marketing and sales methods, and

choice of products or services to offer. *See Circle C. Invs.*, 998 F.2d at 328; *Priba Corp.*, 890 F. Supp. at 593.

While dancing at French Quarter, Plaintiffs did not (and were not expected to) advertise their own services. They did not have their own business cards. They did not work at multiple clubs at the same time. Plaintiffs did not have "the opportunity to exercise the skill and initiative necessary to elevate their status to that of independent contractors." *Priba Corp.*, 890 F. Supp. at 593; *see also Circle C. Invs.*, 998 F.2d at 328 ("A dancer's initiative is essentially limited to decisions involving her costumes and dance routines. The dancers do not exhibit the skill or initiative indicative of persons in business for themselves."). The Court accordingly finds that this factor of the economic reality test also highlights the dancers' economic dependence on French Quarter and weighs in favor of Plaintiffs' employee status.

### D. Permanence of the Working Relationship

"The more permanent the [working] relationship, the more likely it is that a court will find a worker to be an employee." *Thompson*, 779 F. Supp. 2d at 150. In this case, although Ms. Whitworth danced at French Quarter for over two years, even her testimony established that many of the dancers were "transient." Each of the other plaintiffs in this matter only danced at French Quarter for a matter of months. The working relationship

between the club and the dancers in this case, as in many other similar cases, was of a fairly impermanent nature.  The Court therefore finds that this factor weighs against Plaintiffs' employee status.

### E. Extent to Which the Work is an Integral Part of the Business

The evidence in this case clearly established that the main service French Quarter provides to its customers is entertainment by exotic dancers.  "Exotic dancers are obviously essential to the success of a topless nightclub." *Harrell*, 992 F. Supp. at 1352.  It is readily apparent that the work performed by Plaintiffs and other dancers is an integral part of French Quarter's business, and this is an indicator of their economic dependence upon the club.  This factor therefore weighs in favor of Plaintiffs' employee status.

### F. Consideration of All Factors

The only factor that does not weigh in favor of Plaintiffs' employee status is the permanence or duration of the working relationship; however, no one factor in the economic reality analysis is dispositive.  "Many of the courts that have found exotic dancers to be employees under the FLSA did so despite finding the employment relationship lacked a high degree of permanence." *Thompson*, 779 F. Supp. 2d at 150.

Ultimately, Plaintiffs were not independently in the

Page 16 of 30

business of exotic dancing apart from the clubs where they worked. Instead, they were "dependent upon finding employment in the business of others." *Circle C. Invs.*, 998 F.2d at 329. Analysis of the economic reality factors leads this Court to conclude that Plaintiffs were employees of French Quarter for purposes of the FLSA.

### 3. Defendants' Employer Status

The Court has determined that Plaintiffs should be considered employees for FLSA purposes and must now consider whether Defendants are employers. There can be no serious dispute that Defendant French Quarter Partners, LLC, the entity directly responsible for operating the club, must be considered an employer for FLSA purposes. The real issue to be determined is whether Defendant Kloss is also an employer.

The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). "The Eighth Circuit has held that a corporate officer with operational control of the corporation's day-to-day functions is an employer within the meaning of the FLSA." *Simms v. Northport Health Servs. of Ark., L.L.C.*, No. 2:12-CV-02252, 2013 WL 2102974 (W.D. Ark. May 14, 2013) (*citing Wirtz v. Pure Ice Co., Inc.*, 322 F.2d 259, 262-63 (8th Cir. 1963)). The "economic reality" test applies equally to whether workers are employees and to whether managers or

owners are employers. *Irizarry v. Catsimatidis*, 722 F.3d 99, 104 (2d Cir. 2012).

The FLSA's definition of employer must be liberally construed to effectuate Congress's remedial intent. *Circle C. Invs.*, 998 F.2d at 329 (*citing Donovan v. Sabine Irrigation*, 695 F.2d 190, 194 (5th Cir. 1983)). Some individuals have been found to be "employers" for FLSA purposes when they have exercised sufficient "control over the work situation" to be considered the "driving force" behind the company – even absent an ownership interest and control of day-to-day operations. *See Circle C. Invs.*, 998 F.2d at 329; *Irizarry*, 722 F.3d at 109.

Defendants argue Kloss is situated as an absentee owner because he has no day-to-day control over the operation of the French Quarter. Kloss testified that he is solely a non-active owner and investor and that he visits the club mostly for social purposes for a total of about five hours per week. Defendants also point to Plaintiffs' testimony that Kloss did not actually hire them as evidence of Kloss's lack of involvement in club operations (although Nwachukwu testified that Kloss was present during her interview). Plaintiffs, on the other hand, argue Kloss was not an absentee owner but rather a "driving force behind" the establishment. As such, Plaintiffs contend Kloss's operational control over French Quarter's business aspects, including hiring management, setting prices, and overseeing the

club on a daily basis establishes Kloss was Plaintiffs' employer within the meaning of the FLSA. Plaintiffs contend that Kloss was not an absentee owner as he was recognized by the dancers and patrons alike to be a member of management, and his operational control is reflected by French Quarter's menu.[3]

Kloss purchased the club and changed its name to "French Quarter" in 2002. Kloss was responsible for setting the theme and atmosphere of the club. Kloss created the shift report form that is still used to track the club's revenues. Kloss testified that he lives five hundred feet away from French Quarter and often stops by while walking his dog. Whitworth testified that she recalled Kloss being present at the club almost every shift she worked. Kloss admitted that he sometimes discusses business with management when visiting the club. Kloss is the ultimate authority over everyone employed at French Quarter, and is recognized as such by club management and dancers. Kloss exercises control over the music played when he visits the club.[4] He also testified that he has authority to change the dance fees if he wants.

The Court is persuaded that Kloss likely spent more than five hours per week at the club, and that one of his purposes in

---

[3] The evidence established that Kloss was referred to as "Doc" and "the Big Cheese" on French Quarter's menu in connection with its offering of "Doc's Private Dance Room," "Stop Smoking Advice from Doc," and "Asking the Big Cheese to perform a wedding or a funeral . . . ." Plaintiffs' Exhibit 5.

[4] Plaintiff Lewis testified about one occasion on which Kloss changed her music in the middle of a performance.

visiting was to oversee club operations.  The testimony was clear that Kloss was responsible for establishing the initial policies of the club and hiring management to continue to carry out those policies.  The evidence establishes that Kloss was, in fact, the "driving force behind" French Quarter.  Kloss determined the manner in which French Quarter dancers would be paid; accordingly, Kloss was the individual ultimately responsible for the club's compliance (or non-compliance) with the FLSA.  Kloss had sufficient control over the work situation that he was an employer for FLSA purposes.

### 4. **Statute of Limitations**

It is undisputed that no wages were paid by Defendants to Plaintiffs.[5]  Having determined the employee status of Plaintiffs and the employer status of Defendants under the FLSA, the Court finds that Defendants' failure to pay a minimum wage to Plaintiffs constitutes a violation of the FLSA.  In order to determine the applicable statute of limitations, the Court must next consider whether Defendants' failure to pay a minimum wage was willful.  In general, an action for recovery of unpaid minimum wages under the FLSA must be brought within two years

---

[5] In FLSA cases such as this, an analysis of the applicability of certain exemptions (e.g., the "salary exemption" or the "tipped-employee exemption") is often required; however, Defendants have not argued that any exemptions are applicable to the instant case.  For this reason (and because the facts of this case do not appear to support the application of any exemptions), the Court moves on to a determination of statute of limitations and damages issues.

after the cause of action accrued, "except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued . . . ." 29 U.S.C. § 255(a).

When addressing whether an employer has acted "willfully" in connection with a violation of the FLSA, a court must determine whether the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). "Reckless disregard of the requirements of the [FLSA] means failure to make adequate inquiry into whether conduct is in compliance with the Act." 5 C.F.R. § 551.104.

In the instant case, Kloss admitted that he had thought from "day one" about whether French Quarter would need to pay its dancers a minimum wage. He testified that he thought that all clubs employing exotic dancers would have to make such a change at the same time, and that if he did it first, French Quarter would not be able to maintain a competitive presence in the marketplace. The evidence shows that Defendants acted willfully in connection with the violations of the FLSA, and the three-year statute of limitation is therefore applicable. Defendants are accordingly liable for minimum wages that should have been paid to Plaintiffs for the three years prior to the filing of this action. As the Complaint (Doc. 1) was filed on

January 17, 2013, Defendants are liable for unpaid minimum wages
from January 17, 2010 onward.

### 5. AMWA Coverage

The minimum wage provisions of the AMWA apply to every
employer that has at least four employees. Ark. Code Ann. § 11-
4-203(4). In contrast to the requirements for FLSA coverage,
there is no minimum annual volume of business that an employer
must do in order for the AMWA to be applicable (and obviously no
requirement that interstate commerce be implicated). Claims
under the AMWA should generally be determined using the same
analysis as claims under the FLSA.[6]

The evidence at trial indicated that French Quarter had at
least four employees during the relevant time period, and was
therefore subject to the minimum wage requirements of the AMWA.
Under the same analysis conducted above in connection with
Plaintiffs' FLSA claims, the Court finds that Plaintiffs are
employees and Defendants are employers under the AMWA and that
the AMWA was violated when Defendants failed to pay Plaintiffs
the requisite minimum wage. Because there can be no double
recovery, however, and because the FLSA prescribes a higher
minimum wage than the AMWA, the Court proceeds to a

---

[6] The Arkansas Department of Labor, in the regulations it has promulgated
concerning the application of the AMWA, has instructed that "[t]he department
may rely on the interpretations of the U.S. Department of Labor and federal
precedent established under the [FLSA] in interpreting and applying the
provisions of the [AMWA] . . . except to the extent a different
interpretation is clearly required." Ark. Admin. Code § 010.14.1-112.

determination of damages only under the FLSA.

### 6. **Damages**

Having determined that Defendants violated the FLSA by failing to pay Plaintiffs a minimum wage, the Court now considers the issue of damages, beginning with the initial matter of liquidated damages. Liquidated damages in an amount equal to the amount of backpay owed will be awarded unless an employer proves that it acted in good faith and had reasonable grounds for believing that it was not in violation of the FLSA. *See* 29 U.S.C. §§ 216(b) & 260; *Jarrett v. ERC Props., Inc.*, 211 F.3d 1078, 1083 (8th Cir. 2000). The burden is on the employer to prove it acted in good faith. *Broadus v. O.K. Indus., Inc.*, 226 F.3d 937, 944 (8th Cir. 2000). The Court has concluded that Defendants acted willfully in connection with their violation of the FLSA. Defendants have failed to prove that they acted in good faith or had reasonable grounds for believing that they were not in violation of the FLSA. Liquidated damages must therefore be awarded. The Court next addresses the backpay owed to each of the Plaintiffs in turn.

### A. Kristen Whitworth

Plaintiff Whitworth testified that she danced under the names "Catherine" or "Cash" at French Quarter from June 2009 until September 2011. This testimony is corroborated by the shift reports maintained by French Quarter and introduced into

evidence at trial.  These shift reports reflect that Whitworth worked approximately 1,153.23 hours on night shifts between January 17, 2010 and September 10, 2011.[7]  Because the federal minimum wage for the relevant time period was $7.25 per hour, Whitworth is entitled to backpay in the amount of $8,360.92, plus an additional $8,360.92 in liquidated damages.

### B. Tomisha Lewis

Plaintiff Lewis testified that she danced under the name "Charity" at French Quarter from January 2010 until spring or summer of 2010.  The shift reports introduced into evidence reflect that "Charity" worked at French Quarter approximately 498.95 hours on night shifts from January 2010 to May 2010. While Defendants assert that Lewis did not actually dance at

---

[7] Pursuant to 29 U.S.C. § 211(c), employers are required to make, keep, and preserve records of employees' wages, hours, and other conditions and practices of employment.  Where an employer has failed to keep adequate records of wages and hours, employees generally may not be denied recovery of back wages on the ground that the precise extent of their uncompensated work cannot be proved.  *Dole v. Alamo Found.*, 915 F.2d 349, 351 (8th Cir. 1990). Instead, the employees "are to be awarded compensation on the most accurate basis possible." *Id.* (*citing Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946)).  A plaintiff must establish only a "just and reasonable inference" as to the uncompensated work performed, and then the burden shifts to the employer to present evidence as to the precise amount of work performed or evidence to negative the reasonableness of the inference drawn from the employee's evidence.  *Id.*
The exact number of hours Plaintiffs worked during the relevant time period cannot be precisely calculated because certain shift reports are missing a specific "time in" or a "time out."  In some instances, the space under "time in" was marked with the abbreviation "R/O," which stands for "roll over" according to testimony at trial.  This denoted occasions on which a dancer had worked the day shift and then stayed to continue working the night shift. For such occasions, the Court finds that an inference that Plaintiffs began work at the regular shift start time of 8:00 p.m. is reasonable.  In the few instances in which Plaintiffs' "time out" is missing, the evidence warrants an inference that 12:00 a.m. is a reasonable "time out" to use in calculating total hours worked on weekday nights (Monday through Thursday), and 2:00 a.m. on weekend nights (Friday and Saturday).

French Quarter during the relevant time period, the Court finds Lewis's testimony on this matter to be credible.   Lewis is entitled to backpay in the amount of $3,617.39, plus an additional $3,617.39 in liquidated damages.

### C. Krystyna Nwachukwu

Plaintiff Nwachukwu testified that she danced under the name "Irene" at French Quarter from March 2010 until July 2010. The shift reports introduced into evidence reflect that "Irene" worked at French Quarter approximately 293.37 hours on night shifts from March 2010 to July 2010.   Defendants assert that the testimony given by Paige Parks at trial indicates that Nwachukwu did not actually dance at French Quarter during the relevant time period.   Ms. Parks claimed that she was hired to clean the club during the day and that she sometimes danced there under the name "Irene" from March 2010 to July 2010.   Parks claimed to remember all of the other women she danced with at the club, and testified that she was the only one who used the name "Irene" during the time period she danced at the club.   (She also claimed that Lewis was not the "Charity" identified in the shift reports.)   After hearing and reviewing this testimony in detail, the Court does not find Parks's testimony to be credible, and instead credits the testimony of Plaintiffs over that of Parks. The Court finds Nwachukwu's testimony that she danced at French Quarter during the relevant time period to be credible.

Page 25 of 30

Nwachukwu is entitled to backpay in the amount of $2,126.93, plus an additional $2,126.93 in liquidated damages.

### 7. **Successor Liability**

As noted above, French Quarter was operated by King Pawn Shop, Inc. for the first three quarters of 2010 before French Quarter Partners, LLC became the entity that operated the club. While King Pawn Shop, Inc. is not a party to this action, it was the entity that owned and operated the club during the time period when Lewis and Nwachukwu danced there and during a portion of the time Whitworth danced there. The Court must determine whether Defendant French Quarter Partners, LLC should be held liable for the FLSA violations that occurred while the club was owned and operated by King Pawn Shop, Inc.

"The general rule of corporate liability is that, when a corporation sells all of its assets to another, the latter is not responsible for the seller's debts or liabilities, except where: (1) the purchaser expressly or impliedly agrees to assume the obligations; (2) the purchaser is merely a continuation of the selling corporation; or (3) the transaction is entered into to escape liability." *Paschal v. Child Dev., Inc.*, No. 4:12-CV-0184, 2014 WL 55179, *5 (E.D. Ark. Jan. 7, 2014) (*citing Golden State Bottling Co., Inc. v. N.L.R.B.*, 414 U.S. 168, 182 n.5 (1973)). The court in *Paschal* notes that the doctrine of successorship in the labor law context has been significantly

expanded beyond these narrow exceptions, and that the "federal courts have developed a federal common law successorship doctrine that now extends to almost every employment law statute," including the FLSA. *Id.* (*quoting Steinbach v. Hubbard*, 51 F.3d 843, 845 (9th Cir. 1995)). Under this doctrine, the ultimate inquiry is whether imposition of the particular legal obligation at issue would be equitable and in keeping with federal policy. *Id.*

In this case, however, it is not necessary to address the expanded doctrine of successorship under the federal common law, as one of the traditional exceptions is applicable. It is apparent that French Quarter Partners, LLC was merely a continuation of King Pawn Shop, Inc.[8] Kloss stated that he made the decision to transfer ownership of French Quarter in conjunction with professional advice that he received. Kloss testified that he and his wife had been the owners of King Pawn Shop, Inc. and that they also owned French Quarter Partners, LLC. It is evident that French Quarter continued to operate with no interruption following this change in corporate ownership, with the same management, the same dancers, and the same working conditions. This was clearly not a case in which

---

[8] Testimony at trial indicated that, while King Pawn Shop, Inc. had been operating a pawn shop in addition to the club, the pawn shop ceased operations in or around 2010. Instead of continuing to operate the club under King Pawn Shop, Inc., Kloss decided to transfer operation of the club to French Quarter Partners, LLC, which had been formed at the beginning of that year.

one corporate entity purchased another entity's assets in an arm's-length negotiated transaction, but was instead a corporate restructuring in which the only material change was the name and type of entity that operated the club. Accordingly, French Quarter Partners, LLC is liable for unpaid wages Plaintiffs earned while dancing at the club during the period of time it was operated by King Pawn Shop, Inc.

8. **Remaining Damages Issues**

Although the FLSA allows an employer to allocate an employee's tips to satisfy up to fifty percent of the statutory minimum wage requirement, two conditions must first be satisfied: (1) the employer must inform the tipped employees of the provisions of 29 U.S.C. § 203(m); and (2) tipped employees must retain all the tips they receive except those tips included in a tipping pool among employees who customarily receive tips. *See Priba Corp.*, 890 F. Supp. at 595. Defendants did not raise this issue in their pleadings or at trial. Furthermore, the evidence showed that Defendants did not inform Plaintiffs that they would be treated as tipped employees or of the provisions of 29 U.S.C. § 203(m), so any tips received by Plaintiffs may not be applied to offset Defendants' wage obligations to Plaintiffs.

While there was testimony that the dancers shared a portion of their tips with waitresses and other employees, Plaintiffs

did not make any real effort to quantify this amount.  The Court cannot award damages on this claim, as any attempt to put a dollar figure on the amount of tips Plaintiffs may have shared with other employees would be based upon speculation and conjecture.  Plaintiffs have also pled entitlement to return of all "tip out fees" collected by the club pursuant to the Arkansas common law theory of unjust enrichment.  The Court finds, however, that equity is done and Plaintiffs are justly compensated by the award of backpay and liquidated damages as set forth above, and declines to order the return of tip out fees.  For many of the reasons listed in the analysis above (e.g., the fact that Defendants paid the overhead associated with running the club), it is evident that Defendants did provide sufficient value to Plaintiffs that it is not inequitable for Defendants to retain the agreed-upon percentages of the moneys Plaintiffs collected while dancing at French Quarter.

## Conclusion

For the reasons set forth above, the Court finds and concludes that Defendants French Quarter Partners, LLC and Dale Kloss are jointly and severally liable to Plaintiff Kristen Whitworth in the amount of $16,721.84; to Plaintiff Tomisha Lewis in the amount of $7,234.78; and to Plaintiff Krystyna Nwachukwu in the amount of $4,253.86.  The parties have thirty

(30) days to file any motion and briefs in connection with attorneys' fees and costs, including itemization of the same.

IT IS SO ORDERED this 30th day of June, 2014.

/s/ Robert T. Dawson_____
Honorable Robert T. Dawson
United States District Judge